IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| LAWRENCE D. GUESSFORD, JR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:12CV260 |
| | ) | |
| PENNSYLVANIA NATIONAL | ) | |
| MUTUAL CASUALTY | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |


MEMORANDUM OPINION AND ORDER

BEATY, District Judge.

This matter is before the Court on a Motion for Partial Summary Judgment [Doc. #82] filed by Plaintiff Lawrence D. Guessford, Jr. ("Plaintiff") and a Motion for Partial Summary Judgment [Doc. #107] filed by Defendant Pennsylvania National Mutual Casualty Insurance Company ("Defendant"). For the reasons set forth below, this Court will GRANT IN PART and DENY IN PART Plaintiff's Motion for Partial Summary Judgment [Doc. #82], and GRANT IN PART and DENY IN PART Defendant's Motion for Partial Summary Judgment [Doc. #107].

Though Defendant requests that this Court grant its Motion in Limine to Exclude Expert Testimony [Doc. #122] and Motion in Limine to Exclude all Personnel Records and Alternative Compensation Plan Documents [Doc. #126] in deciding Defendant's Motion for Partial Summary Judgment, the Court will defer disposition of those motions to the trial

court, as the evidence at issue in these motions does not pertain to the part of Defendant's Motion for Partial Summary Judgment [Doc. #107] this Court is granting, and this Court need not consider this evidence in order to address the rest of Defendant's Motion. This Court likewise defers all other outstanding evidentiary motions in this case to the trial court.

## I.    FACTUAL BACKGROUND

This case involves two remaining claims surrounding an automobile liability insurance policy issued by Defendant to Plaintiff's employer, Waggoner Manufacturing, Inc. ("Waggoner"). The event underlying the case is a motor vehicle accident on July 6, 2007, in which Plaintiff was traveling on Highway 29 in Salisbury, North Carolina, in a vehicle owned by his employer, Waggoner. A vehicle owned and operated by Rebecca Moore Corriher ("Ms. Corriher") turned left onto Highway 29, directly in front of Plaintiff's oncoming vehicle, causing a collision between Plaintiff's vehicle and Ms. Corriher's vehicle. This collision caused Plaintiff to suffer various severe injuries and required hospitalization, rehabilitation, and physical therapy. At the time of the collision, Ms. Corriher carried a liability insurance policy issued by Nationwide Mutual Insurance Company ("Nationwide") with liability insurance coverage limits of $100,000 per person injured. Additionally, because the crash occurred while Plaintiff was in the scope of his employment, Plaintiff was entitled to workers' compensation benefits, which he received through his employer's workers' compensation insurer, Hartford.

Though the collision occurred on July 6, 2007, Plaintiff did not discover the insurance policy issued by Defendant, providing coverage for Waggoner's vehicle at the time of the collision, until March of 2009. This policy contained underinsured motorist liability

("UIM") coverage up to $1,000,000. In a letter dated March 6, 2009, Nationwide, Ms. Corriher's insurer notified Plaintiff's counsel and Defendant via letter that it tendered its liability limit of $100,000 to Plaintiff in exchange for a covenant not to enforce judgment, and Defendant had 30 days to either advance the policy limit in order to protect its subrogation rights, or forgo subrogation and allow Nationwide to pay its policy limit directly to Plaintiff. On March 9, 2009, Defendant sent Plaintiff correspondence acknowledging Defendant's receipt of a Claim Report concerning Plaintiff's accident and asking Plaintiff to complete a Medical/Wage Release Authorization. On March 16, 2009, Defendant received a letter from Plaintiff's counsel with a copy of Nationwide's letter notifying Defendant of Nationwide's tender of its liability limits and forwarding correspondence regarding total bills paid by Waggoner Manufacturing's workers' compensation carrier, Hartford, to date. After receiving this notification, Defendant notified Plaintiff via a letter dated April 20, 2009, that Defendant elected not to advance Nationwide's tender, choosing instead to waive its subrogation rights against Ms. Corriher. This correspondence also included a request to interview Plaintiff regarding the facts and circumstances surrounding the accident and a request for copies of all medical bills and records.

On July 14, 2009, Plaintiff's counsel sent Defendant a disc containing copies of what the accompanying letter described as "preliminary billing statements," which contained approximately 1,100 pages of medical records and medical bills totaling $457,258.60 for treatment received by Plaintiff as a result of the crash. (Pl.'s Mot. for Partial Summ. J. Ex. 3 [Doc #82-3]). The letter also requested that Defendant advise Plaintiff's counsel "as to Penn National's settlement position in this matter." Id. In addition to sending Defendant

3

these medical bills in July of 2009, Plaintiff sent Defendant at least two updates detailing the amount of medical expenses that had been paid to Plaintiff by Hartford as a proximate result of the accident. Defendant's claim log indicates that Defendant was also in regular communication with Hartford, the workers' compensation carrier, regarding Plaintiff's claim. By November 23, 2009, Hartford had paid Plaintiff $590,620.66 in medical bills and indemnity payments, and this information was provided to Defendant via correspondence on January 29, 2010. Throughout this time, Defendant documented and sought to verify allegations regarding the merits of Plaintiff's claim, including allegations of steroid use outside of a doctor's supervision, that Plaintiff was working a "side job," and questions of whether Plaintiff's later heart attack and diabetes diagnosis were related to or caused by the collision.

On February 16, 2010, Plaintiff's counsel had a phone conversation with Defendant's representative wherein Defendant perhaps implied that it would not consider evaluating Plaintiff's claim until Plaintiff reached maximum medical improvement. Following this phone conversation, on March 1, 2010, Plaintiff's counsel sent a letter to Defendant requesting mediation in March or April of 2010. On March 12, 2010, Defendant responded that it was potentially willing to enter into voluntary mediation, but the medical information received in July of 2009 was incomplete and Plaintiff's claim could not be evaluated until Defendant received more information. Specifically, Defendant stated that Plaintiff had provided "incomplete notes regarding his care after his discharge from the hospital on August 13, 2007 . . . no records from his rehab stay, incomplete office and clinic visit information up to and including July of 2008, and no records thereafter." (Pl.'s Mot. for

Partial Summ. J. Ex. 7 [Doc #82-7].) Further, the letter acknowledged that the potential voluntary mediation between Defendant and Plaintiff might occur "if the [w]orker[s'] [c]ompensation carrier was in agreement and in a position to resolve their lien." Id.

On March 15, 2010, after receiving Defendant's March 12, 2010 correspondence, Plaintiff's counsel sent a letter to Defendant acknowledging that more documents were available regarding the nature and extent of Plaintiff's treatment, but the letter also noted that such additional documentation was not necessary to fairly evaluate the extent of Plaintiff's damages. (Pl.'s Mot. for Partial Summ. J. Ex. 8 [Doc. #82-8].) Further, the letter requested that Defendant forward a medical release authorization for Plaintiff to sign to give Defendant direct access to Plaintiff's medical information. It also included a formal demand for arbitration and designated Plaintiff's arbitrator.

Plaintiff's counsel had indicated her continuing concern about the statute of limitations running against the tortfeasor, Ms. Corriher, in several communications with Defendant. Specifically, Plaintiff's counsel asserted that she was "prepared to initiate a lawsuit against Ms. Corriher personally if [Defendant did] not agree to waive any defenses relating to a statute of limitations." (Pl.'s Mot. for Partial Summ. J. Ex. 10 [Doc. #82-10]; see also Ex. 9 [Doc. #82-9], Ex. 12 [Doc. #82-12].) Defense counsel was under the impression that the demand for arbitration, as contained in the March 15, 2010 letter, would toll the requisite statute of limitations as to any civil action that could be filed by Plaintiff, but acknowledged that often plaintiffs' counsel will "err on the side of caution" by filing suit.

(Pl.'s Mot. for Partial Summ. J. Ex. 12 [Doc. #82-12], at 1-3.)[1] Defendant did not agree to waive a statute of limitations defense, and in turn, Plaintiff filed a civil action against Ms. Corriher on June 30, 2010, as Plaintiff's counsel believed it was necessary in order to toll the statute of limitations. Shortly after Plaintiff filed the civil action, Defendant served Plaintiff with a set of discovery requests, which Plaintiff formally provided discovery responses for on September 3, 2010. These discovery responses contained materials detailing accident-related medical expenses totaling $727,753.32. Thereafter, Plaintiff was deposed in this matter on October 9, 2010.

Following the discovery requests relating to the pending tort action, an arbitration hearing related to the insurance contract was set for January 18, 2011. Before arbitration, on January 12, 2011, Defendant made its first settlement offer to Plaintiff of $525,000. Defendant adopted its defense counsel's strategic choice not to explain how its offer was calculated. In fact, Defendant never provided any explanation for its basis of settlement. Plaintiff rejected this offer and proceeded to arbitration on January 18, 2011. On January 31, 2011, the arbitration panel determined the overall value of Plaintiff's claim to be $2,500,000.

After the award from the arbitration panel, Defendant tendered payment of $900,000[2] to Plaintiff on February 17, 2011. This payment also contained a release for Plaintiff to sign in order to release all potential claims against Defendant. In response to this

---

[1] When referring to the page numbers of either party's exhibits, the Court will use the page number assigned to the document by the Clerk's Office during docketing rather than the page number assigned by the party, if the numbers differ.

[2] This figure encompasses Plaintiff's $1,000,000 UIM coverage limit from Defendant less the $100,000 paid to Plaintiff by Ms. Corriher's insurer, Nationwide.

release, Plaintiff's counsel notified Defendant that the check would not be deposited until an agreement was reached allowing Plaintiff to accept the check without signing the release and without prejudice to pursuing any claims against Defendant arising out of Defendant's handling of Plaintiff's claim. Defendant subsequently allowed Plaintiff to accept the $900,000 without signing a release and without prejudice on February 25, 2011. On July 5, 2011, the North Carolina Industrial Commission ordered distribution of the $900,000 as follows: $100,000 of Defendant's payment to be distributed to Hartford in satisfaction of the negotiated workers' compensation lien, $304,395.77 of Defendant's payment to be distributed to Plaintiff's counsel to pay for expenses and counsel's fee in accordance with the fee arrangement, and the remaining sum of $495,604.23 of Defendant's payment to be distributed to Plaintiff.

Following the $900,000 payment, Plaintiff filed this action against Defendant in Superior Court in Rowan County, North Carolina, on February 14, 2012, alleging three separate counts: breach of contract, unfair and deceptive trade practices, and refusal to settle in good faith.[3] Thereafter, Defendant removed the case based on diversity jurisdiction.[4] After removal, both parties filed Motions for Judgment on the Pleadings [Docs. #21, #28], along with briefs. As a result, this Court granted Defendant's Motion for Judgment on the

---

[3] While Plaintiff labeled his third claim as "Refusal to Settle in Good Faith," a tort claim of this sort is more appropriately referred to under North Carolina law as an insurance company's "Bad Faith Refusal to Settle." As such, this classification will be used throughout this Opinion in reference to Plaintiff's claim for punitive damages.

[4] Plaintiff is a citizen of Rowan County and Defendant is an insurance company with its principal office and place of business in Harrisburg, Pennsylvania. Further, the amount in controversy exceeds $75,000. Accordingly, this Court has appropriate subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

7

Pleadings [Doc. #21] and ordered that Plaintiff's breach of contract claim be dismissed. (Mem. Op. and Order [Doc. #51].)  The Court as well granted Plaintiff's Motion to Strike Defendant's affirmative defenses of accord and satisfaction, statute of limitations, laches, failure to cooperate, contract defenses, arbitration and award, and unclean hands.  Id.  The Court also dismissed Defendant's assertion of the affirmative defense of advice of counsel as to Plaintiff's unfair or deceptive trade practices claim.  Id.

Upon completion of discovery, Plaintiff filed the present Motion for Partial Summary Judgment [Doc. #82].  Defendant also filed its own Motion for Partial Summary Judgment [Doc. #107].  The parties' respective Motions for Partial Summary Judgment have been fully briefed and are properly before the Court for review.  Defendant also filed a Motion in Limine to Exclude Expert Testimony of Robert Dietz, Plaintiff's Bad Faith Expert [Doc. #122], as well as a Motion in Limine to Exclude All Personnel Records and Alternative Compensation Plan Documents and/or in the Alternative to Exclude Evidence of Adjusters' Compensation and Training, Including Expert Testimony [Doc. #126].  Because the evidence at issue in these motions in limine does not pertain to the part of Defendant's Motion for Partial Summary Judgment [Doc. #107] this Court is granting, the Court defers consideration of the motions in limine (and all other outstanding motions) to the trial court.

## II.  LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court shall grant summary judgment when there exists no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Woolard v. Gallagher, 712 F.3d 865, 873 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).  Parties may seek partial

summary judgment on some of the claims or defenses at issue or just part of a claim or defense. Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine dispute of material fact which requires trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

When making a summary judgment determination, the court must view the evidence and all reasonable inferences from the evidence in the light most favorable to the non-moving party. Vathekan v. Prince George's County, 154 F.3d 173, 175 (4th Cir. 1998) (quoting Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991)). Moreover, the Court should not grant a motion for summary judgment "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994) (quoting Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967)) (internal quotation marks omitted). Nevertheless, a mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). Instead, there must be evidence "on which the jury could reasonably find for the [non-movant]." Id.

Further, in considering these Motions for Partial Summary Judgment [Docs. #82, #107], this Court, sitting in diversity, is obliged to apply the substantive law of the state in which it sits. Volvo Const. Equip. North Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 599-600 (4th Cir. 2004) (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 79, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941)). Thus, the Court will apply North Carolina substantive law in evaluating the sufficiency of each party's motion for partial summary judgment.

With this standard in mind, the Court will address Plaintiff's Motion for Partial Summary Judgment [Doc. #82] and Defendant's Motion for Partial Summary Judgment [Doc. #107] in turn.

## III. DISCUSSION

Plaintiff moves for partial summary judgment on (1) certain acts constituting unfair or deceptive trade practices; (2) damages in the form of increased attorneys' fees and court filing fees incurred as a result of Defendant's violation of N.C. Gen. Stat. § 58-63-15(11)(g); (3) the Defendant's affirmative defense of failure to mitigate damages; and (4) the Defendant's defense of advice of counsel as it related to Defendant's evaluation of Plaintiff's insurance claim. (Pl.'s Mot. for Partial Summ. J. [Doc. #82], at 1.) On the other hand, Defendant moves for partial summary judgment on (1) the "scope of damages" Plaintiff may seek (specifically that Plaintiff may not include the original $900,000 underinsured motorist coverage limit as a component of his damages); (2) how interest should be calculated if any interest is awarded to Plaintiff (specifically that Plaintiff should not receive the North Carolina Judgment Rate of Interest and that any interest awarded should be awarded only on

the proceeds that Plaintiff could have actually invested); and (3) Plaintiff's bad faith refusal to settle claim. (Def.'s Mot. for Partial Summ. J. [Doc. #107], at 2-3.) Each of these grounds will be addressed in turn.

A. **Plaintiff's Motion for Partial Summary Judgment**

  i. **Plaintiff's Unfair or Deceptive Trade Practices Act ("UDTPA") Claim**

In the underlying matter, Plaintiff's Amended Complaint alleges violations of North Carolina's Unfair or Deceptive Trade Practices Act ("UDTPA"), N.C. General Statute § 75-1.1. In order to establish a violation of North Carolina's UDTPA, a plaintiff must show "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Gray v. North Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). The North Carolina Supreme Court has noted that when an insurance company engages in a practice or act constituting an unfair claim settlement practice under N.C. General Statute § 58-63-15(11) ("§ 58-63-15(11)"), it "also engages in conduct that embodies the broader standards of N.C.G.S. § 75-1.1 because such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers." Id. at 71, 529 S.E.2d at 683. Section 58-63-15(11) was "designed to protect the consuming public." Id. at 70, 529 S.E.2d at 682. This protection is accomplished through the enumeration of "insurance specific" unfair or deceptive trade acts or practices within § 58-63-15(11). Lenoir Mall, LLC v. State Farm Fire and Cas. Co., No. 5:10-cv-40, 2011 WL 3682794, at *3 (W.D.N.C. Aug. 23, 2011). Therefore, although violations of § 58-63-15(11) are actionable only by the Commissioner of Insurance, the types of conduct enumerated in § 58-63-15(11) can be used to support a private plaintiff's cause of action under the UDTPA. See

11

<u>Federated Mut. Ins. Co. v. Williams Trull Co., Inc.</u>, 838 F. Supp. 2d 370, 421 (M.D.N.C. 2011).

In fact, North Carolina courts have recognized that a violation of any conduct described within § 58-63-15(11) constitutes an unfair or deceptive act or practice under the UDTPA as a matter of law. <u>Gray</u>, 352 N.C. at 71, 529 S.E.2d at 683 ("[C]onduct that violates subsection (f) of N.C.G.S. § 58–63–15(11) constitutes a violation of N.C.G.S. § 75–1.1, as a matter of law[.]"); <u>Country Club of Johnston Cnty, Inc. v. U.S. Fid. & Guar. Co.</u>, 150 N.C. App. 231, 246, 563 S.E.2d 269, 279 (2002) (extending the holding in <u>Gray</u> to all conduct described in § 58-63-15(11)). Furthermore, with respect to the second element, "commerce" is defined in the UDTPA to include "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b) (2011). There is no dispute that the interactions between Plaintiff and Defendant in their respective insured and insurer capacities constitute a business activity, and thus, that the second prong of Plaintiff's UDTPA claim ("in or affecting commerce") is satisfied. As a result, if Plaintiff can prove that Defendant acted in a way that violated § 58-63-15(11), and that he suffered an actual injury proximately caused by that violation, then Plaintiff will be able to establish his UDTPA claim and thereby may seek treble damages arising from the alleged UDTPA violation. <u>See Gray</u>, 352 N.C. at 74-75, 529 S.E.2d at 684-85.

In that regard, Plaintiff's Amended Complaint alleges numerous violations of § 58-63-15(11), any of which, if proven, would constitute an unfair or deceptive act or practice under the UDTPA as a matter of law. However, Plaintiff's Partial Motion for Summary

Judgment only seeks partial summary judgment against Defendant for alleged violations of the following five unfair claim settlement practices enumerated in § 58-63-15(11):

> (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information; (f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g) Compelling the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured; (n) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

N.C. Gen. Stat. § 58-63-15(11)(b), (d), (f), (g), (n) (2011).

Plaintiff has presented evidence with regard to each of these enumerated subsections in support of his Motion for Partial Summary Judgment as to his UDTPA claim. This Court will examine evidence that Plaintiff cites for subsections (b), (d), and (f) together, as the Court has determined that common genuine disputes of material fact will preclude a grant of partial summary judgment on each of these bases. This Court will then examine Plaintiff's claims based on conduct described in subsections (g) and (n).

Genuine disputes of material fact exist with respect to this claim with respect to § 58-63-15(11)(b) (failure to acknowledge and act reasonably promptly), (d) (refusal to pay without conducting a reasonable investigation), and (f) (not attempting in good faith to effectuate prompt, fair, and equitable settlement when liability became reasonably clear). First, Plaintiff contends that Defendant failed to respond to letters for "months at a time" and that Defendant's "failure to name an arbitrator for over 90 days can hardly be characterized as prompt." (Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 10).

More specifically, Plaintiff contends that Defendant failed to respond timely or at all to correspondence from Plaintiff's counsel in three instances: (1) the letter sent on July 14, 2009, with enclosed medical records and requesting Defendant's position as to settlement; (2) the follow-up letter sent on August 7, 2009; and (3) the March 15, 2010[5] letter demanding arbitration and naming Plaintiff's arbitrator. (Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 9, 10.) Plaintiff contends that Defendant never responded to the first two letters and Defendant did not send Plaintiff its selection for an arbitrator until June 14, 2010 (approximately 90 days after Plaintiff's request for selection). Id.

Defendant does not dispute that it did not respond to either the July 14 or the August 7 letter "directly" (Def.'s Resp. [Doc. #105], at 10) and when its 30(b)(6) designee, Ronald Joyce, was asked whether Defendant would "handle [Plaintiff's] claim any differently if it had it to do over again today," he responded, "[o]nly perhaps with respect to having responded to a letter sooner, perhaps, than we did. . . ." and confirmed that his answer was in reference to these two letters. (Pl.'s Mot. for Partial Summ. J. Ex. 22 [Doc. #83-1[6]], at 44-45.). Defendant disputes that it received the August 7 letter (Def.'s Resp. [Doc. #105], at 10), but Defendant's own admission that it should have responded sooner to those letters and Defendant's own production of that letter in discovery both seem to belie that contention. (Pl.'s Mot. for Partial Summ. J. Ex. 4 [Doc. #82-4], at 1.)

---

[5] Defendant describes this as "Plaintiff's 3/15/09 demand for arbitration" (Def.'s Resp. [Doc. #105], at 11), but the Court notes this letter is dated March 15, 2010. (Pl.'s Mot. for Partial Summ. J. Ex. 8 [Doc. #82-8]).

[6] The Court notes that Document #83-1, as well as Document #83-2 and Document #83-3, are sealed. They are referenced here for the limited purpose of analysis in this order, but otherwise remain sealed for other purposes.

However, Defendant asserts that the reasonableness of its actions with respect to these communications must be considered in context. Specifically, Defendant argues that while it did not *acknowledge* the July 14 and August 7 letters "directly," it did not fail to *act* reasonably promptly upon the information provided by those communications. (Def.'s Resp. [Doc. #105], at 10). Specifically, Defendant contends that it acted by submitting the information provided by Plaintiff with the July 14 letter to its medical consultant, Hoover, which concluded that the information provided by Plaintiff was "far from complete." Id. Defendant's claim log indicates that the information provided was all related to the collision (see Def.'s Resp. Ex. 11 [Doc. #105-11], at 7), but Defendant contends that it understood that additional information would be forthcoming, in light of the transmittal letter's description of the information provided as "preliminary." (Def.'s Resp. [Doc. #105], at 10.) Defendant also asserts that it "understood that Plaintiff's counsel was awaiting the resolution of the [workers' compensation] claim before completing Plaintiff's presentation of medical documentation." Id.

Defendant, however, does not explain its delay in naming an arbitrator, except to say that when defense counsel called Plaintiff's counsel on April 22, 2010, he learned that she was "out on maternity leave." (Def.'s Resp. [Doc. #105] at 11.) Nevertheless, Plaintiff's counsel notified defense counsel that she returned from maternity leave in a letter dated May 4, 2010, reiterating her request to schedule the arbitration and asking that Defendant designate its arbitrator. (Pl.'s Mot. for Partial Summ. J. Ex. 9 [Doc. #82-9].) Defendant attempts to refute Plaintiff's argument by citing several delays by Plaintiff's counsel with respect to her interaction with the tortfeasor's insurance company, Nationwide, and the

workers' compensation carrier, Hartford. Defendant argues that Plaintiff's counsel's duty to act zealously on behalf of her client is a greater standard than Defendant's duty to act reasonably promptly. (Def.'s Resp. [Doc. #105], at 11, 12.) It is not clear to the Court, however, how Plaintiff's counsel's duty of professional responsibility is relevant to, or somehow negates, Defendant's obligation to acknowledge and act reasonably promptly upon communications with respect to claims arising under its policies, as required by N.C. General Statute § 58-63-15(11)(b). Regardless, denial of summary judgment with respect to § 58-63-15(11)(b) is still warranted, in light of genuine disputes of material fact already discussed as to the basis of Defendant's reasons for delayed responses.

Second, with respect to Plaintiff's relief under the UDTPA as to conduct recognized under § 58-63-15(11)(d) (refusal to pay without conducting a reasonable investigation) and § 58-63-15(11)(f) (not attempting in good faith to effectuate prompt, fair, and equitable settlement when liability became reasonably clear), there are also genuine disputes of material fact. For example, whether Plaintiff was diligent in providing the necessary records to Defendant so that it could reasonably investigate the claim affects whether Defendant conducted a reasonable investigation and attempted in good faith to settle. It is undisputed that Plaintiff provided a disc of approximately 1,100 medical records that he described as "preliminary" in July 2009, and that Plaintiff had more medical records than he provided at that time but declined to furnish them to Defendant until the discovery process required him to. On the other hand, it is also undisputed that Defendant notified Plaintiff on multiple occasions that it needed additional medical records for resolution of Plaintiff's claim. However, there is a genuine dispute as to whether Defendant communicated to Plaintiff that

16

it would take the lead on gathering the additional documentation required for resolution of Plaintiff's claim, and in turn, whether Plaintiff's counsel understood that more medical records were necessary before Plaintiff's claim could be resolved. Both parties claim to have either sent a medical release authorization form (in Defendant's case) or requested a medical release authorization form (in Plaintiff's case), in order to speed the process along. Resolution of these disputes of material fact are necessary to determine whether Defendant's delays in resolving Plaintiff's claim were reasonable.

Furthermore, Defendant attributed some of the delay to investigation of allegations that would offset the nature of Plaintiff's claim for damages, such as allegations of steroid use by Plaintiff outside of a doctor's supervision (Def.'s Resp. Ex. 11 [Doc. #105-11], at 9), that Plaintiff was working a "side job" (id. at 3), and a concern of whether Plaintiff's later heart attack was related to or could have been caused by the collision (id. at 9). Whether the reports of Plaintiff's activities unrelated to the accident were credible, and whether Defendant's investigation into those allegations provided a reasonable basis for the delay of the resolution of Plaintiff's claim, involves disputes of material fact that are properly reserved for the fact finder.

In addition, whether each party indeed had a desire or were motivated to engage in voluntary mediation affects the reasonableness of any delay on the part of either party. (Compare Def.'s Resp. [Doc. #105], at 14 with Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 12 n.5 (citing Pl.'s Mot. for Partial Summ. J. Ex. 12 [Doc. #82-12]).) While neither party was required to enter into voluntary mediation in this case, a willingness to do

so on Defendant's part may reflect an indication that Defendant was attempting to act in good faith.

Finally, as it relates to whether Defendant acted in good faith in making a settlement offer, there is a dispute as to what information Defendant took into account in calculating its one settlement offer that was made prior to arbitration. However, it is undisputed that Defendant made only one settlement offer prior to arbitration (a week before the arbitration hearing and over six months after Plaintiff filed his civil suit against the tortfeasor, Ms. Corriher) for $525,000. Plaintiff contends that Defendant failed to consider hundreds of thousands of dollars worth of medical expenses in making its one settlement offer and that its consideration of the workers' compensation lien was unreasonable. (Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 10-11.) To support this contention, Plaintiff maintains that although Defendant admits that a reasonable investigation of a claim includes considering all medical expenses submitted by a claimant, Defendant's internal communications indicate a failure to consider the entirety of the $727,000 of medical bills and accompanying records it received on September 3, 2010 (all of which causally related to the wreck) in calculating its settlement offer on January 12, 2011. Id. While defense counsel admits he did not list the $727,000 of bills in the evaluation of Plaintiff's claim (specifically, his evaluation listed that less than $387,000 of medical expenses could be verified) (Pl.'s Mem. in Support of Partial Summ. J. Ex. 24 [Doc. #83-3], at 7; see also Pl.'s Mot. for Partial Summ. J. Ex. 18 [Doc. #82-18], at 13-14), defense counsel now contends that the $727,000 figure "would have been what [he] used" in calculating Defendant's settlement offer. (Def.'s Resp. [Doc. #105], at 12 (citing Def.'s Resp. Ex. 27 [Doc. #105-27] at 54-55).)

In addition, Plaintiff asserts the unreasonableness of Defendant's offer to the extent that the offer reflected a far too optimistic view about the resolution of the workers' compensation lien. (Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 6.) With regard to the lien amount, defense counsel states that in his calculation leading to the $525,000 offer, he assumed "for purposes of the math" that the workers' compensation lien would be totally eliminated, but he admits that "in reality I would expect there would be some lien amount that survived" (though he clarifies that he would not think that amount would be "much"). (Pl.'s Mot. for Partial Summ. J. Ex. 18 [Doc. #82-18], at 15.) Defendant contends that its offer of $525,000 was less than the total medical bills disclosed because its counsel underwent the "Walker/Austin analysis" in calculating its settlement offer.[7] (Def.'s Resp. [Doc. #105], at 13.) However, no such explanation was presented to Plaintiff or

---

[7] The "Walker/Austin analysis" is in reference to the two-step process for determining the amount due to a plaintiff from a UIM carrier as outlined by the North Carolina Court of Appeals in Austin v. Midgett, 166 N.C. App. 740, 603 S.E.2d 855 (2004), and Walker v. Penn Nat'l Sec. Ins. Co., 168 N.C. App. 555, 608 S.E.2d 107 (2005). First, the UIM coverage limit "is determined by subtracting the amount paid by the liability carrier from the UIM policy limit." Walker, 168 N.C. App. at 558, 608 S.E.2d at 110 (citing Austin, 166 N.C. App. at 741, 603 S.E.2d at 856). Second, the plaintiff is entitled to receive "the total value of plaintiff's loss [minus] the amount of workers' compensation benefits (not including the amount of the workers' compensation lien) and the amount received from the liability carrier." Id. at 558-59, 608 S.E.2d at 110 (citing Austin, 166 N.C. App. at 742, 603 S.E.2d at 856). A UIM carrier is then required to pay the plaintiff the sum that he is entitled to receive, plus interest, up to the UIM coverage limit. Austin, 166 N.C. App. at 743, 603 S.E.2d at 857; see also Walker, 168 N.C. App. at 561, 608 S.E.2d at 111.

Defendant's settlement offer appears to be based on defense counsel's application of this process: estimating Plaintiff's total loss at $1.25 million (the midway point of defense counsel's estimated range of the value of Plaintiff's claim at $1 million to $1.5 million) minus $627,628.30 (what defense counsel stated was the amount of workers' compensation benefits paid as of December 28, 2010) plus $0 (no estimated workers' compensation lien was factored into this calculation) minus $100,000 (liability coverage) equals $522,371.70, which was the basis for Defendant's settlement offer of $525,000. (Pl.'s Mot. for Partial Summ. J. Ex. 24 [Doc. #83-3], at 8.)

Plaintiff's counsel when Defendant presented this proposed offer of settlement. Resolution of these disputes of material fact are necessary in determining whether Defendant attempted in good faith to effectuate prompt, fair, and equitable settlement when liability became reasonably clear.

Plaintiff also requests partial summary judgment on his UDTPA claim with regard to conduct described in in § 58-63-15(11)(g)—namely, that Defendant allegedly compelled the insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured. Neither party disputes that Plaintiff filed suit before any settlement offer was extended by Defendant. Plaintiff contends that he was compelled to litigate in order to toll the statute of limitations against the tortfeasor, and in turn, foreclose any statute of limitations defense that might otherwise be available to Defendant. (Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 12.) Defendant's internal communications indicate that its counsel believed that the statute of limitations was not at risk of running, because Plaintiff's March 15, 2010 formal demand for arbitration tolled the statute of limitations. (Pl.'s Mot. for Partial Summ. J. Ex. 12 [Doc. #82-12], at 1.) Though Defense counsel seemed to believe the requisite statute of limitations was already tolled, Defendant nonetheless declined to waive its statute of limitations defense. Id.

Because the statute of limitations is the basis for Plaintiff's argument that Defendant's actions compelled her to initiate a civil action, the Court must address the issue of when Plaintiff's claim for UIM coverage accrued, in order to determine whether there was in fact a statute of limitations issue which required Plaintiff to file suit. At the time Plaintiff filed suit

on June 30, 2010, there is no evidence that either party questioned Plaintiff's counsel's assertion that the date of accrual for Plaintiff's UIM claim was the date of Plaintiff's collision with Ms. Corriher.  (e.g., id. at 1-3; Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 12.)  However, under North Carolina law, an insured's right to UIM coverage is expressly conditioned by statute on the exhaustion of the liability carrier's policy limits.  N.C. Gen. Stat. § 20-279.21(e) (2011); Register v. White, 358 N.C. 691, 698, 599 S.E.2d 549, 555 (2004) ("[U]nder both the policy and the governing statute, an insured's contractual right to UIM coverage is expressly conditioned on the exhaustion of the liability carrier's policy limits.").  Exhaustion occurs "when the liability carrier has tendered the limits of its policy in a settlement offer or in satisfaction of a judgment."  Register, 358 N.C. at 698, 599 S.E.2d at 555.  Therefore, "[o]nce this exhaustion requirement is satisfied, *but not before*, an insured may seek UIM benefits from a UIM carrier."  Id. (emphasis added).

Thus, Plaintiff could not recover benefits from his employer's UIM carrier until Ms. Corriher's liability insurer, Nationwide, tendered its policy limits in March 2009, nineteen months after the collision.  As such, Plaintiff was not facing an imminent statute of limitations deadline when it filed suit in June 2010, because the statute of limitations for Plaintiff's claim to UIM coverage began in March 2009, rather than in July 2007 when the collision occurred.   As Plaintiff did not cite any other basis for its contention that Defendant's conduct compelled litigation in violation of § 58-63-15(11)(g), the Court will deny Plaintiff's Motion for Partial Summary Judgment [Doc. #82] on this basis, because Plaintiff failed to demonstrate that it is entitled to judgment as a matter of law on this ground.

The final basis upon which Plaintiff urges this Court to grant summary judgment as to his UDTPA claim is that Defendant's failure to provide an explanation of the basis of its settlement offer was conduct in violation of § 58-63-15(11)(n). Section 58-63-15(11)(n) states that it is an unfair claim settlement practice to "fail[ ] to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." N.C. Gen. Stat. § 58-63-15(11)(n) (2011). As previously discussed, conduct described under § 58-63-15(11)(n), like any conduct enumerated under § 58-63-15(11), constitutes an unfair or deceptive practice as a matter of law under North Carolina's UDTPA. Gray, 352 N.C. at 71, 529 S.E.2d at 683; Country Club of Johnston Cnty, Inc., 150 N.C. App. at 246, 563 S.E.2d at 279.

Defendant admits that it "believe[s] that an insurance company must promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." (Pl.'s Mot. for Summ. J. Ex. 22 [Doc. #83-1], at 5.) Despite this admission, the record reflects that Defendant failed to promptly provide a reasonable explanation of the basis for its offer of a compromise settlement. Indeed, Defendant does not dispute that it refused to provide Plaintiff with *any* explanation of the basis for its compromise settlement. This failure to explain the settlement offer was not accidental—it appears Defendant relied on defense counsel's strategic decision not to explain the offer to Plaintiff's counsel, or even to present the explanation at the arbitration hearing, out of fear that "if [it] spend[s] too much energy trying to 'educate' the plaintiff about the workers' comp offset prior to the award, she will

appeal to the panel for a large award far in excess of our limits."  (Pl.'s Mot. for Partial Summ. J. Ex. 15 [Doc. #82-15], at 2; see also Ex. 22 [Doc. #83-1] at 35-36, 40.)

Nevertheless, Defendant argues that this conduct should not be considered a violation of the UDPTA because, "[w]here consumers are represented by counsel throughout the pendency of a claim, [§ 58-63-15(11)] is not applicable."  (Def.'s Resp. [Doc. #105], at 16.)  Defendant does not offer any legal support for this proposition. Viewing the evidence in the light most favorable to Defendant, this Court finds that Plaintiff is entitled to summary judgment on the basis that Defendant's violation of § 58-63-15(11)(n) constituted an unfair and deceptive trade practice in violation of the UDTPA.

Therefore, Plaintiff may be able to recover treble damages if he can show that he suffered actual injury that was proximately caused by this conduct.  Gray, 352 N.C. at 68, 74, 529 S.E.2d at 681, 684-85.  This Court notes that "what constitutes proximate cause between a deceptive act and a plaintiff's damages remains ambiguous."  ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co., 472 F.3d 99, 126 (4th Cir. 2006) (quoting Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 903 (4th Cir. 1996)).  Because genuine disputes of material fact exist regarding whether Plaintiff suffered any injury from this unfair and deceptive trade practice (and if so, to what extent), this Court will allow the issue of damages to proceed to trial.  Furthermore, as genuine disputes of material fact remain as to several other bases for Plaintiff's UDTPA claim, any injury resulting from this particular violation may be considered in tandem with any injury resulting from any other violations of the UDTPA that the fact finder may determine occurred.  Therefore, Plaintiff's Motion for Partial Summary Judgment [Doc. #82] is granted to the extent that Defendant's conduct

constitutes an unfair and deceptive trade practice under the UDTPA, but this Court will leave the issue of damages relating to this claim for the fact finder.

### ii. Plaintiff's Damages in the Form of Increased Attorneys' Fees due to Defendant's Conduct in Violation of § 58-63-15(11)(g)

Plaintiff's Motion for Partial Summary Judgment [Doc. #82] also requests that the Court award him "damages in the form of increased attorneys' fees and court filing fees incurred as a result of Defendant's violation of N.C. Gen. Stat. § 58-63-15(11)(g)." As discussed above, § 58-63-15(11)(g) prohibits an insurance company from compelling the insured to institute litigation in order to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured. As previously explained, this Court is denying Plaintiff's Motion for Partial Summary Judgment [Doc. #82] regarding liability based on the conduct described in N.C. Gen Stat. § 58-63-15(11)(g), because Plaintiff failed to demonstrate that he is entitled to judgment as a matter of law on this basis. Therefore, the Court at this time also denies Plaintiff's request for damages based on that conduct.

### iii. Plaintiff's Request for Summary Judgment Regarding Defendant's Affirmative Defense of Failure to Mitigate Damages

Plaintiff's Motion for Partial Summary Judgment [Doc. #82] further asks that the Court grant summary judgment on the issue of whether Defendant may utilize the affirmative defense of failure to mitigate damages, because "Defendant cannot show that any act of Plaintiff which occurred after his cause of action accrued contributed to any of his damages." (Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 14.) Plaintiff asserts that the first act upon which Defendant's tortious conduct arose was Defendant's failure to

24

respond to the letter sent July 14, 2009.  Id. at 15.  Plaintiff further asserts that 30 days is a reasonable period for response by Defendant.  Id.  Therefore, Plaintiff contends that Defendant cannot rely on any actions by Plaintiff that occurred before August 13, 2009, as support for its defense of failure to mitigate.  Id.

Defendant responds by arguing that Plaintiff failed to mitigate his damages by not providing the requisite documentation for evaluation.  (Def.'s Resp. [Doc. #105], at 17-18.) Specifically, Defendant contends that Plaintiff never returned a signed medical authorization sent by Defendant to Plaintiff.  Id. at 17.  Further, Defendant relies on the fact that Plaintiff did not provide any additional medical records beyond those Plaintiff described as "preliminary" until formal discovery began.  Id. at 17.  Defendant also argues that Plaintiff declined to participate in voluntary mediation, which would have required Plaintiff to produce more medical records earlier, and therefore, an earlier resolution could have been reached.  Id. at 18.  Finally, Defendant goes into much detail about interactions between Plaintiff's counsel and other parties—namely the tortfeasor's liability insurer, Nationwide, and the workers' compensation insurance provider, Hartford.  Id. at 18-19.  Defendant asserts that such interactions also indicate that Plaintiff failed to mitigate his damages with respect to Defendant.  Id.

North Carolina recognizes a failure to mitigate damages as a valid affirmative defense. See Elm St. Gallery, Inc. v. Williams, 191 N.C. App. 760, 762, 663 S.E.2d 874, 875 (2008). The purpose of asserting the affirmative defense of failure to mitigate damages is to introduce "facts which show that the plaintiff's . . . cause of action does not entitle him to so large an amount as the showing on his side would otherwise justify the jury in allowing him."

25

Scott v. Foppe, 247 N.C. 67, 71, 100 S.E.2d 238, 240-41 (1957) (citing 1 Sutherland, Damages, 4th ed., § 149).

The Court finds that genuine disputes of material fact preclude summary judgment for Plaintiff on the affirmative defense of failure to mitigate damages. The Court has already discussed the genuine disputes regarding the degree of Plaintiff's cooperation and whether he should have been more forthcoming with assistance in providing medical records (or access to them), in addition to the genuine disputes surrounding Plaintiff and Defendant's respective willingness to undergo voluntary mediation. Even assuming, *arguendo*, that Defendant cannot rely on any failure of Plaintiff to mitigate damages before August 13, 2009, these disputes remained at issue long after August 13, 2009. Because of these genuine disputes of material fact, this Court will deny Plaintiff's Motion for Partial Summary Judgment [Doc. #82] with regard to Defendant's affirmative defense of failure to mitigate damages.

### iv. Plaintiff's Request for Summary Judgment Regarding Defendant's Affirmative Defense of Advice of Counsel

Plaintiff's Motion for Partial Summary Judgment [Doc. #82] also requests summary judgment on the issue of whether Defendant may utilize the affirmative defense of advice of counsel. (Pl.'s Mot. for Partial Summ. J. [Doc. #82], at 1.) Specifically, Plaintiff contends that Defendant may not rely on advice of counsel as a defense because Defendant had a "nondelegable duty" to evaluate Plaintiff's claim. (Pl.'s Mem. in Support of Partial Summ. J. [Doc. #84], at 19-20.) Plaintiff further asserts that delegation of that duty violates Defendant's "duties under N.C. Gen. Stat. § 58-63-15(11)," and thus, Defendant may not use that same conduct "as a shield to punitive damages." Id. at 20.

26

This Court has already held that the affirmative defense of advice of counsel is not applicable to Plaintiff's UDTPA claim, because it is well accepted by North Carolina courts that good faith is not a defense to a UDTPA claim. (Mem. Op. and Order [Doc. #51], at 28 (citing Gray, 352 N.C. at 68, S.E.2d at 683).) Furthermore, the Court allowed Defendant to retain this defense for Plaintiff's bad faith refusal to settle claim, not as a complete defense, but as a factor that may be considered by a jury in assessing the aggravated conduct requirement of a claim for punitive damages. See id. at 27-28 (citing Miller v. Brooks, 123 N.C. App. 20, 31, 472 S.E.2d 350, 357 (1996)). But Plaintiff does not identify any legal support specific to why Defendant's "nondelegable duty" to evaluate Plaintiff's claim precludes this defense in the punitive damages context. While Plaintiff's argument relies on § 58-63-15(11), Plaintiff does not cite a specific provision of that statute that Defendant violated by delegating its evaluation of Plaintiff's claim, and this Court does not identify any such "nondelegable duty" expressly stated within the statute. Furthermore, Plaintiff need not rely on any conduct that violates § 58-63-15(11) to prevail on a bad faith refusal to settle claim, though such conduct may be considered a factor contributing to the bad faith refusal to settle claim's aggravated conduct requirement. See Lovell, 108 N.C. App. at 420, 424 S.E.2d at 184; Kielbania v. Indian Harbor Ins. Co., No. 1:11CV663, 2012 WL 3957926, at *12 (M.D.N.C. September 10, 2012) (citing Smith v. Nationwide Mut. Fire Ins. Co., 96 N.C. App. 215, 218, 385 S.E.2d 152, 154 (1989)). Plaintiff also does not distinguish Miller v. Brooks, which this Court previously relied on in its Memorandum Opinion and Order [Doc. #51] in denying Plaintiff's Motion to Strike [Doc. #28] as to the affirmative defense

27

of advice of counsel with respect to Plaintiff's bad faith refusal to settle. (Mem. Op. and Order [Doc. #51], at 27-28.)

Plaintiff, therefore, has failed to demonstrate that he is entitled to judgment as a matter of law on this issue, and this Court will accordingly deny Plaintiff's Motion for Partial Summary Judgment [Doc. #82] with regard to Defendant's affirmative defense of advice of counsel.

### B. Defendant's Motion for Partial Summary Judgment

#### i. Defendant's Request for Summary Judgment on the Scope of Damages Plaintiff May be Entitled to Receive

Defendant's Motion for Partial Summary Judgment [Doc. #107] requests that the Court restrict the scope of damages Plaintiff can recover under either the UDTPA claim or the bad faith refusal to settle claim which remain in this case. (Def.'s Mot. for Partial Summ. J. [Doc. #107], at 1-2.) Specifically, Defendant contends that Plaintiff is "attempting to inflate his damages in this litigation impermissibly" by including the $900,000 policy limit that Defendant has already paid Plaintiff as an element of the compensatory damages that would be trebled for the UDTPA claim (and then giving Defendant a credit for that payment). (Def.'s Mem. in Support of Partial Summ. J. [Doc. #108], at 9 (citing Ex. 4 [Doc. #108-4]).) Similarly, Defendant asserts that Plaintiff is trying to use the $900,000 policy limit "as a basis to establish a larger cap on his potential punitive damages" under his bad faith refusal to settle claim. Id.

Plaintiff, however, contends that the $900,000 policy limit should be included in his UDTPA damages, because "North Carolina law is clear: where a defendant commits an unfair trade practice and thereby delays paying what he owes, he does so at peril of paying

28

treble the amount he delayed paying." (Pl.'s Resp. [Doc. #116], at 8 (citing <u>Garlock v. Henson</u>, 112 N.C. App. 243, 435 S.E.2d 114 (1993) and <u>Vazquez v. Allstate Ins. Co.</u>, 137 N.C. App. 741, 529 S.E.2d 480 (2000)).) In support of this conclusion, Plaintiff relies on three North Carolina cases: <u>Garlock</u>, <u>Vazquez</u>, and <u>Cullen v. Valley Forge Life Ins. Co.</u>, 161 N.C. App. 570, 589 S.E.2d 423 (2003). However, Plaintiff's reliance on these three cases is misplaced to the extent he claims that his actual injury under the UDTPA claim includes the $900,000 paid by Defendant under the policy. A critical distinction between the cases cited by Plaintiff and this case is that each of the defendants in <u>Garlock</u>, <u>Vazquez</u>, and <u>Cullen</u> still owed money on the contract when damages were awarded. See <u>Garlock</u>, 112 N.C. App. at 244-45, 435 S.E.2d at 114; <u>Vazquez</u>, 137 N.C. App. at 742-43, 745, 529 S.E.2d at 481, 482; <u>Cullen</u>, 161 N.C. App. at 573-74, 589 S.E.2d at 427-28. Therefore, the basis for incorporating amounts due under the contracts into trebled UDTPA damages in <u>Garlock</u>, <u>Vazquez</u>, and <u>Cullen</u> stems from the fact that those damages were part of the respective plaintiffs' actual injury under the UDTPA that had not yet been paid. Such a specific actual injury is absent in this case, where Defendant has already paid the $900,000 policy limit.

<u>Garlock</u> in fact stands for the proposition that a Defendant cannot foreclose a Plaintiff's recovery under the UDTPA merely by belatedly satisfying its contractual obligation. See <u>Garlock</u>, 112 N.C. App. at 246, 435 S.E.2d at 116 (1993) ("The basis of defendant's argument is that because plaintiff ultimately received the amount due under the contract, defendant's misleading statements did not cause additional damages but only delayed recovery. On that ground, defendant argues that plaintiff may not maintain an action for unfair and deceptive trade practices because plaintiff suffered no actual injury

29

from the deceptive conduct. We disagree with defendant's perception of this case."). The same reasoning applies in <u>Vazquez</u>. 137 N.C. App. at 745, 529 S.E.2d at 482 ("If plaintiff elects to recover under G.S. § 75-1.1, the defendant cannot prevent that recovery by stipulating to pay damages for the breach of contract claim. The <u>Garlock</u> holding makes clear that the right to the receipt of contract damages does not eliminate plaintiff's injury under the unfair and deceptive trade practices claim."). The same principle holds true in <u>Cullen</u>. 161 N.C. App. at 578, 589 S.E.2d at 430 ("[W]e note plaintiff's unfair and deceptive practices claim is not barred simply because plaintiff prevailed in his breach of contract claim."). Therefore, Defendant here cannot foreclose UDTPA liability merely because it has already paid its $900,000 policy limit. But that fact does not lead to the conclusion that Plaintiff may incorporate the $900,000 payment into its damages when Defendant has already paid the policy limit. Unlike the plaintiffs in <u>Garlock</u>, <u>Vazquez</u>, and <u>Cullen</u> who were still owed money under their respective contracts, the $900,000 payment to Plaintiff in this case is not part of Plaintiff's actual injury. Therefore, Defendant's request for summary judgment is granted to the extent that Plaintiff may not include the $900,000 policy limit that Defendant already paid as part of Plaintiff's damages calculation under the UDTPA claim asserted here.

Defendant's Motion for Partial Summary Judgment [Doc. #107] also requests a limitation of the scope of punitive damages Plaintiff may seek. North Carolina law allows the awarding of punitive damages only if a plaintiff "proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) [f]raud[;] (2)

"[m]alice[;] (3) [w]illful or wanton conduct." N.C. Gen. Stat. § 1D-15(a) (2011). Furthermore, the plaintiff "must prove the existence of an aggravating factor by clear and convincing evidence." Id. § 1D-15(b).

In addition, punitive damages are awarded "above and beyond actual damages, as a punishment for the defendant's intentional wrong." Brown v. Novartis Pharmaceuticals Corp., No. 7:08-CV-130-FL, 2012 WL 3066588, at *7 (E.D.N.C. July 27, 2012) (quoting Rhyne v. K-Mart Corp., 358 N.C. 160, 166, 594 S.E.2d 1 (2004)). Moreover, "[i]n all actions seeking an award of punitive damages, the trier of fact shall determine the amount of punitive damages separately from the amount of compensation for all other damages." N.C. Gen. Stat. § 1D-25(a) (2011). This Court notes, however, that "[p]unitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater." Id. § 1D-25(b). Because the punitive damages determination is different from the treble damages determination under UDTPA, and Defendant does not provide any legal support for its argument limiting the scope of punitive damages, this Court will deny Defendant's request to limit the scope of punitive damages.

Therefore, this Court will grant Defendant's Motion for Partial Summary Judgment [Doc. #107] in so far as Plaintiff may not include the $900,000 policy limit as part of his actual injury under a UDTPA claim. However, the Court will deny Defendant's Motion for Partial Judgment [Doc. #107] in that it requests some limitation on the scope of punitive damages Plaintiff may seek if he is able to establish a bad faith refusal to settle claim at trial.

### ii. Defendant's Request for Summary Judgment on Issues Pertaining to Interest

Defendant's Motion for Partial Summary Judgment [Doc. #107] also requests that the Court determine as a matter of law some issues regarding interest. With respect to the interest rate applicable, Defendant requests that "any award of [i]nterest damages be awarded at the U.S. Treasury Bill Rate." (Def.'s Mot. for Partial Summ. J. [Doc. #107], at 2-3.) Defendant also requests that any interest awarded be applied only to that which Plaintiff could have actually invested. Id. at 3.

Prejudgment interest is a matter of state substantive law. Sec. Ins. Co. of Hartford v. Arcade Textiles, Inc., 40 F. App'x 767, 769-70 (4th Cir. 2002) (citing Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 633 (4th Cir. 1999)). Thus, because this case sits in diversity, the state interest rate of 8% mandated by N.C. General Statute § 24-1 will be used if prejudgment interest is warranted in a tort claim. See N.C. Gen. Stat. § 24-5(b) (2011) ("In an action other than contract, any portion of a money judgment designated by the factfinder as compensatory damages bears interest from the date the action is commenced until the judgment is satisfied."); Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc., No. 1:01CV182, 2003 WL 21650004, at *5 (M.D.N.C. July 10, 2003) (holding that the prejudgment interest rate applicable in a diversity case where Plaintiff prevailed on a claim under North Carolina's UDTPA statute was that prescribed under N.C. General Statute § 24-5(b)) (citing United States v. Dollar Rent A Car Sys., Inc., 712 F.2d 938, 940 (4th Cir. 1983)). Therefore, this Court denies Defendant's Motion for Partial Summary Judgment to the extent that it contends that the prejudgment interest rate applicable is not the state

interest rate of 8%, because Defendant has failed to demonstrate that it is entitled to judgment as a matter of law on the issue.

Furthermore, any postjudgment interest rate is determined pursuant to 28 U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." See Forest Sales Corp. v. Bedingfield, 881 F.2d 111, 113 (4th Cir. 1989) (holding that in diversity actions, postjudgment interest should be calculated at the federal, rather than state, rate). Section 1961(a) mandates that "[s]uch interest shall be calculated from the date of entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment." 28 U.S.C. § 1961(a) (2006). To the extent that Defendant is requesting that a different rate apply to postjudgment interest, that request is denied.

Defendant also contends that interest should only be awarded based on what Plaintiff actually could have invested—namely, Plaintiff's damages reduced by Hartford's lien and attorney fees and costs. (Def.'s Mot. for Partial Summ. J. [Doc. #107], at 3.) Defendant has not provided any legal support for this position. This Court has previously held that prejudgment and postjudgment interest applies to the entire trebled amount awarded under a UDTPA claim. See Volumetrics, 2003 WL 21650004, at *5 (quoting N.C. Gen. Stat. § 24-5(b) and citing Custom Molders, Inc. v. Am. Yard Prods., Inc., 342 N.C. 133, 140, 463 S.E.2d 199, 203 (1995)). Therefore, this Court rejects Defendant's contention that any interest awarded should only be calculated based on what Plaintiff could have actually invested.

In sum, the Court denies Defendant's Motion for Partial Summary Judgment [Doc. #107] in so far as it requests that the Court apply an interest rate other than that prescribed by law. The Court also denies Defendant's Motion for Partial Summary Judgment [Doc. #107] with respect to the argument that any interest awarded to Plaintiff should be calculated based only upon what Plaintiff could have actually invested.

### iii. Defendant's Request for Summary Judgment on Plaintiff's Bad Faith Refusal to Settle Claim

In the underlying matter, Plaintiff's Amended Complaint asserts a claim for punitive damages for bad faith refusal to settle. (Am. Compl. [Doc. #18], at 20-24.) In order to recover punitive damages for the tort of an insurance company's bad faith refusal to settle, a plaintiff must prove: (1) a refusal to pay after recognition of a valid claim; (2) bad faith; and (3) aggravating or outrageous conduct. Lovell v. Nationwide Mut. Ins. Co., 108 N.C. App. 416, 420, 424 S.E.2d 181, 184 (1993), aff'd, 334 N.C. 682, 435 S.E.2d 71 (1993). In this context, bad faith means "not based on honest disagreement or innocent mistake." Id. at 421, 424 S.E.2d at 185. The third element, aggravating or outrageous conduct, may be shown by "fraud, malice, gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of plaintiff's rights." Id. at 422, 424 S.E.2d at 185. North Carolina courts have recognized that "[a] low settlement offer in violation of N.C. General Statute § 58-63-15(11)(h) is also a factor contributing to aggravated conduct." Kielbania, 2012 WL 3957926, at *12 (citing Smith v. Nationwide Mut. Fire Ins. Co., 96 N.C. App. 215, 218, 385 S.E.2d 152, 154 (1989)).

Defendant contends that it should be granted summary judgment on this claim based on five facts that illustrate that it did not refuse to settle Plaintiff's claim in bad faith. (Def.'s

Mot. for Partial Summ. J. [Doc. #107], at 3.)  Namely, Defendant asserts that (1) Plaintiff never demanded a specific sum for his claim, (2) the value of Plaintiff's claim was never established prior to arbitration, (3) the workers' compensation lien was not resolved until July 2011 (after the pendency of Plaintiff's claim), (4) Defendant never actually denied Plaintiff's claim, and (5) Defendant was willing (but Plaintiff ultimately refused) to participate in voluntary mediation.  Id.  Defendant contends that, based on these facts, Plaintiff has failed to establish one or more elements of a bad faith refusal to settle claim, and in turn, Defendant is entitled to judgment as a matter of law on this claim.  (Def.'s Mem. in Support of Partial Summ. J. [Doc. #108], at 14-20.)  This Court will examine each of these facts asserted by Defendant in turn.

First, Defendant states that "[i]t must be recognized" that Plaintiff did not make a demand for settlement of a specific sum until arbitration, and contends that this somehow negates the "recognition of a valid claim" requirement of the first element of a bad faith refusal to settle claim.  (Def.'s Mem. in Support of Partial Summ. J. [Doc. #108], at 15.) Furthermore, Defendant seems to imply that because it never officially denied Plaintiff's claim, its conduct was, at worst, "constructive denial" of the claim, and "[n]o N.C. or Fourth Circuit case is found in which any insurer was considered to have acted in bad faith based on 'constructive denial' of a claim."  Id. at 20.  However, in Lovell v. Nationwide Mutual Insurance, the defendant alleged (among other things), that "plaintiff failed to make a formal demand for payment" and that it "did not actually refuse to pay the claim."  108 N.C. App. at 420, 424 S.E.2d at 184.  The Lovell plaintiff countered that defendant "never mentioned the need to formally demand payment" and "[t]he fact that the bills remained

35

unpaid until defendant's response to the complaint indicates a refusal to pay." Id. at 421, 424 S.E.2d at 184-85. The plaintiff in Lovell also testified that "he had, in fact, repeatedly inquired through one of defendant's agents as to the status of the [claim]." Id. at 421, 424 S.E.2d at 185. The North Carolina Court of Appeals rejected the Lovell defendant's two arguments, stating that "submission of the bills . . . to defendant was obviously a sufficient indication of the [plaintiff's] desire to be paid under the . . . provisions of their insurance policy" and "nothing in the policy required a formal demand for payment." Id. at 421, 422, 424 S.E.2d at 185. Despite the plaintiff not formally demanding payment and the fact that the defendant did not actually refuse to pay, the Lovell court held that the jury could reasonably draw the inference that defendant's "failure to pay was intentional, in bad faith, and not due to innocent mistake or honest disagreement," and upheld the jury's verdict of punitive damages on this claim. Id. at 422, 427, 424 S.E.2d at 185, 188.

Similar to Lovell, Plaintiff's counsel in this case repeatedly inquired about the status of Plaintiff's claim, and Defendant's internal communications illustrate that Plaintiff's submission of medical bills to Defendant gave it sufficient notice of the validity of Plaintiff's claim. Furthermore, Defendant has not cited any provision in the UIM policy that would have required Plaintiff to make a formal demand for a specific amount of payment in a UIM claim. Moreover, as noted above, Defendant's own internal valuation of Plaintiff's claim tends to show that Defendant was aware at least as early as June 25, 2010, that Plaintiff's counsel "seem[ed] to be of the view that we will owe the arbitration award minus $100,000 (the liability coverage limit)." (Pl.'s Mot. for Partial Summ. J. Ex. 23 [Doc. #83-2], at 2; see Ex. 24 [Doc. #83-3], at 8 (Defendant making an estimation of the value of Plaintiff's claim

36



unpaid until defendant's response to the complaint indicates a refusal to pay." Id. at 421, 424 S.E.2d at 184-85. The plaintiff in Lovell also testified that "he had, in fact, repeatedly inquired through one of defendant's agents as to the status of the [claim]." Id. at 421, 424 S.E.2d at 185. The North Carolina Court of Appeals rejected the Lovell defendant's two arguments, stating that "submission of the bills . . . to defendant was obviously a sufficient indication of the [plaintiff's] desire to be paid under the . . . provisions of their insurance policy" and "nothing in the policy required a formal demand for payment." Id. at 421, 422, 424 S.E.2d at 185. Despite the plaintiff not formally demanding payment and the fact that the defendant did not actually refuse to pay, the Lovell court held that the jury could reasonably draw the inference that defendant's "failure to pay was intentional, in bad faith, and not due to innocent mistake or honest disagreement," and upheld the jury's verdict of punitive damages on this claim. Id. at 422, 427, 424 S.E.2d at 185, 188.

Similar to Lovell, Plaintiff's counsel in this case repeatedly inquired about the status of Plaintiff's claim, and Defendant's internal communications illustrate that Plaintiff's submission of medical bills to Defendant gave it sufficient notice of the validity of Plaintiff's claim. Furthermore, Defendant has not cited any provision in the UIM policy that would have required Plaintiff to make a formal demand for a specific amount of payment in a UIM claim. Moreover, as noted above, Defendant's own internal valuation of Plaintiff's claim tends to show that Defendant was aware at least as early as June 25, 2010, that Plaintiff's counsel "seem[ed] to be of the view that we will owe the arbitration award minus $100,000 (the liability coverage limit)." (Pl.'s Mot. for Partial Summ. J. Ex. 23 [Doc. #83-2], at 2; see Ex. 24 [Doc. #83-3], at 8 (Defendant making an estimation of the value of Plaintiff's claim

in December 2010).) As such, this Court rejects Defendant's contention that Plaintiff's lack of demand for a specific sum for his claim and the fact that Defendant never technically denied Plaintiff's claim preclude Plaintiff from prevailing on a bad faith refusal to settle claim.

Defendant also contends that its delayed resolution of Plaintiff's claim could not have been in bad faith, because the workers' compensation lien was not resolved until July 2011, after the arbitration proceeding concluded. Essentially, Defendant argues that because it could deduct the payments made to Plaintiff by the workers' compensation carrier (less the lien), it was not bad faith for Defendant to wait until that lien was resolved before satisfying its UIM obligations to Plaintiff. In support of this contention, Defendant quotes its contract provision stating that it "will not pay for any element of 'loss' under any [workers' compensation], disability benefits or similar law exclusive of non-occupational disability benefits." (Def.'s Mem. in Support of Partial Summ. J. [Doc. #108], at 15.) Defendant also relies upon N.C. General Statute § 20-279.21(e), which states in pertinent part that UIM coverage shall insure the portion of the loss "uncompensated by any [workers' compensation] law and the amount of an employer's lien determined pursuant to G.S. 97-10.2(h) or (j)." N.C. Gen. Stat. § 20-279.21(e) (2011).

It is well settled that UIM coverage does not include amounts paid by the tortfeasor's liability carrier or amounts paid by a workers' compensation carrier, less the amount of the workers' compensation lien. <u>See, e.g.</u>, N.C. Gen. Stat. § 20.279.21(e); <u>Walker v. Pennsylvania National Security Ins. Co.</u>, 168 N.C. App. 555, 558-59, 608 S.E.2d 107, 109, 110 (2005). As such, if a tortfeasor's liability claim has been resolved, workers' compensation benefits have

been paid, and the amount of a workers' compensation lien has been determined, Defendant is correct that the insurer is entitled to deduct the amount paid to a claimant for the underlying liability claim and the workers' compensation benefits paid to the claimant, less the amount of the workers' compensation lien.

However, the amount that Defendant can deduct from its UIM obligation is a separate issue from the question of whether Defendant can wait until the lien amount has been finalized before satisfying its UIM obligation. Though a UIM carrier may wait until the underlying liability claim has been resolved before making its UIM payment (see Register v. White, 358 N.C. 691, 698, 599 S.E.2d 549, 555 (2004)), Defendant has not cited any statutory requirement or case law that requires, or even necessarily allows, an insurer to wait until the workers' compensation lien amount has been finalized before paying. So while Defendant could ultimately receive a reduction based on the finalized workers' compensation lien, resolution of that lien was not a prerequisite to Plaintiff making a valid UIM claim. As a result, Defendant had no basis for delaying its UIM obligations until resolution of the workers' compensation lien. Relying on this argument in delaying payment of Plaintiff's UIM coverage may have been an honest mistake or something more egregious, but such outstanding questions of fact render summary judgment based on this argument inappropriate.

In addition, Defendant contends that it should prevail on summary judgment on this claim because the value of Plaintiff's claim was never established prior to arbitration. Genuine disputes of material fact exist regarding this contention. Defendant admits that liability was established "reasonably quickly" and that it was a "fair statement" to say that

38

"the liability investigation in this case really would not have been responsible for any appreciable–consuming any [sic] appreciable time in the claims process." (Pl.'s Mot. for Summ. J. Ex. 22 [Doc. #83-1], at 8.) However, Defendant argues that recognition of a valid claim as required in a bad faith refusal to settle claim necessarily entails recognizing the amount of the claim, rather than just the liability. (Def.'s Mem. in Support of Partial Summ. J. [Doc. #108], at 15.) Though Defendant asserts that the value of Plaintiff's claim was never established prior to arbitration, Defendant's internal communications indicate that it was at least making some attempt to estimate the value of the claim leading up to and informing that offer, and as previously explained, the basis of the settlement offer is a matter of genuine dispute of material fact.

Furthermore, a lack of valuation of Plaintiff's claim does not necessarily demonstrate a lack of bad faith on Defendant's part. Indeed, if the fact finder determines that Plaintiff did provide the requisite documentation for Defendant to make a proper valuation of Plaintiff's claim in July 2009, then a lack of valuation of Plaintiff's claim until arbitration a year and a half later may be evidence tending to show that Defendant acted in bad faith in refusing to settle. In addition, given the evidence tending to show that Defendant intended for some time prior to arbitration to wait and establish the claim value through the arbitration process (e.g., Pl.'s Mot. for Summ. J. Ex. 23 [Doc. #83-2]), this lack of claim valuation contention by Defendant may not support Defendant's assertion of a defense to an allegation of bad faith on its part.

Finally, Defendant asserts that it was willing (but Plaintiff ultimately refused) to participate in voluntary mediation. As previously explained, Defendant is correct that this

39

might help negate the argument that Defendant acted in bad faith. However, as discussed in the context of Plaintiff's UDTPA claim, genuine disputes of material fact exist regarding each party's willingness to participate in voluntary mediation. Therefore, this Court will deny Defendant's Motion for Partial Summary Judgment [Doc. #107] with regard to Plaintiff's claim of bad faith refusal to settle on the part of Defendant.

## IV. CONCLUSION

For the reasons discussed above, it is ORDERED that Plaintiff's Motion for Partial Summary Judgment [Doc. # 82] shall be GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's Motion for Partial Summary Judgment [Doc. # 82] will be GRANTED as to Defendant's failure to reasonably explain its settlement offer constituting an unfair or deceptive trade practice. However, the issue of damages on this basis will proceed to trial. Furthermore, Plaintiff's Motion for Partial Summary Judgment [Doc. #82] will be DENIED as to damages for conduct described in § 58-63-15(11)(g). In addition, Plaintiff's Motion for Partial Summary Judgment [Doc. #82] is also DENIED as to the affirmative defenses of failure to mitigate damages and advice of counsel.

IT IS FURTHER ORDERED that Defendant's Motion for Partial Summary Judgment [Doc. # 107] shall be GRANTED IN PART and DENIED IN PART. Specifically, Defendant's Motion for Partial Summary Judgment [Doc. # 107] will be GRANTED in that Plaintiff is precluded from including the policy limit payment by Defendant as part of his actual injury under a UDTPA claim. Defendant's Motion for Partial Summary Judgment [Doc. #107] will be DENIED as to Defendant's request to limit the scope of Plaintiff's punitive damages and to apply a different interest rate than that

prescribed by law.  Finally, Defendant's Motion for Partial Summary Judgment [Doc. #107]

will be DENIED as to Plaintiff's bad faith refusal to settle claim.

This, the  18th day of October, 2013.

United States District Judge